## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

IT WORKS MARKETING, INC.,

     Plaintiff,

v.                                                             Case No. 8:20-cv-1743-T-KKM-TGW

MELALEUCA, INC. et al.,

     Defendants.

_____/

## **ORDER**

     Melaleuca, Inc. moves to dismiss It Works' amended complaint. (Doc. 118). Alternatively, Melaleuca moves to compel It Works to arbitrate its claims against Melaleuca. (*Id.*). It Works opposes Melaleuca's motions. (Doc. 129).

     Because Melaleuca is not a signatory to the arbitration agreement between It Works and the Distributor Defendants, the Court will deny Melaleuca's motion to compel arbitration. Additionally, It Works alleges plausible claims for relief for tortious interference with a business relationship, misappropriation of a trade secret under the Defend Trade Secrets Act, and misappropriation of a trade secret under the Florida Uniform Trade Secrets Act. But It Works fails to state a claim for relief for false advertising under the Lanham Act. Thus, the Court will grant-in-part and deny-in-part Melaleuca's motion to dismiss. Lastly, the Court will stay this case pending the arbitrator's decision on the arbitrability of It Works' claims for injunctive relief against

the Distributor Defendants.

## Background

It Works is a multi-level-marketing sales company that sells health and beauty products. (Doc. 107, ¶1). The company uses individual distributors to promote and sell its products. (*Id.* at ¶1, 30). To become a distributor for It Works, an individual must agree to It Works' Distributor Agreement, which includes Terms and Conditions. (*Id.* at ¶30). That agreement requires distributors not to sell "any competing non-It Works! programs, products or services." (*Id.* at ¶36; Doc. 107-2, p. 17). The noncompete provision lasts for as long as a distributor sells It Works products and for six months after the Distributor Agreement is cancelled. (Doc. 107-2, p. 17).

Distributors also agree not to disclose confidential and proprietary information or trade secrets, (Doc. 107, ¶37; Doc. 107-2, p. 18), including Downline Activity Reports, (Doc. 107, ¶37; Doc. 107-2, p. 18). A Downline Activity Report is information about sales activity, revenue, and income generated from either distributors personally sponsored by an individual distributor or from other distributors who are part of an individual distributor's downline organization. (Doc. 107, ¶42).

It Works' confidential, proprietary, and trade secret information can be found on its eSuite website. (*Id.*). This website lists information about It Works' "proposed products and services; financial affairs; actual and potential customers and customer information; downline distributors; organizational matters; business and marketing

strategies; business operations, methodologies, and practices; sourcing terms and companies utilized; and hardware, operating systems, and infrastructure." (*Id.*).

Relevant here, the Distributor Agreement includes an arbitration provision. (Doc. 107-2, p. 2). That provision states that if a dispute exists between a distributor and It Works "arising from or relating to the [a]greement," the parties agree to resolve the dispute through mediation. (*Id.*). If mediation fails, "the dispute and [sic] shall be settled totally and finally by confidential arbitration as more fully described in the Policies & Procedures." (*Id.*). Despite the seemingly exclusive route of arbitration provided in the previous provision, the Distributor Agreement carves out claims for certain kinds of equitable relief in court:

> Notwithstanding the foregoing, either Party may bring an action before the courts seeking a restraining order, temporary or permanent injunction, or other equitable relief to protect its intellectual property rights, including but not limited to customer and/or Distributor lists as well as other trade secrets, trademarks, trade names, patents, and copyrights.

(*Id.*).

The Policies and Procedures section of the Distributor Agreement includes a section entitled "Arbitration." (Doc. 107-2, p. 24). That section repeats how arbitration will be the primary means of resolving disputes: "Except as otherwise provided in the Agreement, any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled through confidential arbitration." (*Id.*). Per its terms, arbitration will be conducted under the AAA's rules. (*Id.*). And the "Arbitration" section

3

specifies that the Federal Arbitration Act (FAA) will "govern all matters relating to arbitration." (*Id.*).

Melaleuca, Inc., directly competes with It Works. (Doc. 107, ¶1). At various times, the individual defendants, each a former It Works distributor (Distributor Defendants), stopped selling It Works products and began selling products for Melaleuca. (*Id.* at ¶¶6–19, 111–12). But at no time was Melaleuca a party to the Distributor Agreement between It Works and the Distributor Defendants. (*Id.* at ¶¶ 24, 30–34).

According to the allegations, Melaleuca encouraged the Distributor Defendants while they worked for It Works to break their agreements with It Works to become Melaleuca distributors. (*Id.* at ¶51). Melaleuca targeted the Distributor Defendants because they had access to It Works' trade secrets and confidential information. (*Id.* at ¶52). Specifically, Melaleuca's goal was to obtain—through the Distributor Defendants—It Works' confidential information about which distributors were most profitable. (*Id.*).

Melaleuca accomplished its goal, successfully recruiting the Distributor Defendants, each of whom was a highly profitable former distributor for It Works. (*Id.* at ¶53.). What is more, Melaleuca successfully obtained access to It Works' Downline Activity Reports and eSuite. (*Id.*). Melaleuca continues to target It Works distributors by helping the Distributor Defendants misrepresent their current income with

4

Melaleuca. (*Id.* at ¶¶ 65–66). For example, Melaleuca endorses fake, high-amount checks, which the Distributor Defendants then post on social media and message to It Works distributors to entice them to leave It Works and join Melaleuca. (*Id.* at ¶¶65–66, 68–69, 83–85). Melaleuca also gives its distributors inaccurate "Business Report Summaries" that contain misleading information about how much its distributors earn, and its distributors, in turn, share those summaries with It Works distributors to bring them to Melaleuca. (*Id.* at ¶90).

To redress these alleged wrongs, It Works brings four claims against Melaleuca: one for tortious interference with a business relationship (Count II); one under the Lanham Act for false advertising (Count III); one under the Defend Trade Secrets Act (Count IV); and one under the Florida Uniform Trade Secrets Act (Count V). (Doc. 107). Melaleuca moves to dismiss It Works' claims against Melaleuca. (Doc. 118). Alternatively, Melaleuca moves to compel arbitration of It Works' claims. (*Id.*).

## Analysis

### Motion to Compel Arbitration

Melaleuca argues that It Works must arbitrate its claims against Melaleuca under the arbitration provision in the Distributor Agreement. (Doc. 118, pp. 6–7). According to Melaleuca, it can enforce the arbitration provision even though it's a non-signatory because It Works alleges interdependent misconduct between the Distributor Defendants and Melaleuca. (*Id.* at 7–10). Melaleuca also argues that It Works must rely

on the Distributor Agreement for its claims against Melaleuca and that It Works' claims fall within the scope of the Distributor Agreement's arbitration provision. (*Id.* at 10–15). As a result, Melaleuca presses that the Court should require It Works to arbitrate its claims against Melaleuca. (*Id.* at 15).

It Works contends that the Distributor Agreement does not cover disputes against Melaleuca: the provision applies to disputes only between It Works and its distributors. (Doc. 129, p. 4–8). Moreover, It Works argues that Melaleuca seeks to arbitrate It Works' claims solely to delay proceeding so that "more of the defendants' post-employment obligations will have expired." (*Id.* at 8–9).

A non-party to an agreement that contains an arbitration provision may compel arbitration if the relevant state contract law allows the non-party to enforce the agreement. *Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1903 (2009); *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011). In Florida, a non-signatory can use equitable estoppel to compel a signatory to arbitrate claims if (1) the non-signatory shows that the signatory is relying on the agreement to assert its claims against the non-signatory and (2) the scope of the arbitration provision covers the dispute. *Kroma Makeup v. Boldfact Licensing*, 845 F.3d 1351, 1354 (11th Cir. 2017).

*Kroma* governs here. There, non-signatories to an agreement (Kimberly, Kourtney, and Khloe Kardashian) moved to compel a signatory (Kroma) to arbitrate claims under an arbitration provision in Kroma's agreement with another corporation.

6

845 F.3d at 1353–54. The arbitration provision stated that "the parties agree that the disputes arising between them concerning the validity, interpretation, termination or performance" of the agreement would be arbitrated. *Id.* at 1355 (quoting arbitration provision). But because the Kardashians were not parties to the agreement between Kroma and the other corporation, that agreement's arbitration provision did not cover the dispute between the Kardashians and Kroma. *Id.* at 1355–56. As a result, the Kardashians could not compel Kroma to arbitrate their dispute. *Id.* at 1356; *see also Beck Auto Sales v. Asbury Jax Ford*, 249 So. 3d 765, 768 (Fla. 1st Dist. Ct. App. 2018) (Winsor, J.) (holding that non-signatory could not compel signatory to arbitrate claims under equitable estoppel because the arbitration provision limited its applicability to disputes "between the parties" and the non-signatory was not a party to the agreement).

It Works' dispute with Melaleuca falls outside the scope of the Distributor Agreement's arbitration clause, and therefore Melaleuca cannot compel arbitration under it. The Terms and Conditions of the Distributor Agreement limit applicability of its arbitration provision to "dispute[s] between a Distributor and It Works arising from or relating to the [Distributor] Agreement." (Doc. 107-2, p. 2). As a result, It Works did not agree to arbitrate claims between itself and non-signatory third parties, and the claims presented against Melaleuca do not fall within the Distributor Agreement's arbitration clause.

Melaleuca does not argue that it is a party to the Distributor Agreement, that the

Distributor Defendants acted as agents of Melaleuca when they agreed to the Distributor Agreement, or that Melaleuca obtained rights or obligations under the Distributor Agreement. (*See* Docs. 118; 196). Instead, in its supplemental brief, Melaleuca argues that the arbitration provision in the Distributor Agreement is broader than the provision in *Kroma*; so, Melaleuca's claims are covered by the arbitration provision here. (Doc. 196, pp. 1–6).

Melaleuca points to language in Section 8.4 of the Distributor Agreement, entitled "Arbitration." (Doc. 107-2, p. 24). That section provides details on arbitration: "Except as otherwise provided in the Agreement, any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled through confidential arbitration." (*Id.*). Melaleuca argues that, unlike the Terms and Conditions, this language does not limit arbitration to It Works and a distributor.

Melaleuca's argument fails—a harmonious interpretation of the Distributor Agreement demonstrates that the arbitration provision is limited to disputes between It Works and a distributor. To begin, this Court must interpret the Distributor Agreement consistent with Florida law. *See In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009). In Florida, courts must read contractual provisions harmoniously to give effect to each provision. *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 180–82 ("The provisions of a text should be interpreted in a way that renders them compatible, not

contradictory.").

Next, the Distributor Agreement includes both the Terms and Conditions—which specifically limit the arbitration provision to disputes between It Works and a distributor—and the Policies and Procedures—which generally discuss how claims must be settled through arbitration. (*See* Doc. 107-2, p. 1) (stating that the Policies and Procedures, It Works Compensation Plan, and Terms and Conditions constitute the Distributor Agreement). Further, the Terms and Conditions state that "[i]f there is any conflict between the Distributor Terms & Conditions and the Policies & Procedures, the Distributor Terms & Conditions shall prevail." (*Id.* at 2). To read these sections harmoniously together and give each effect, as required by Florida law and good textual interpretation, the specific limiting language in the Terms and Conditions controls over the general language in the Policies and Procedures. *See Tonfi v. Prime Homes at Villa*, No. 07-22952-CIV-JORDAN, 2008 WL 11333242, at *5 (S.D. Fla. June 4, 2008) (Jordan, J.) (discussing the general-specific canon in the context of contract interpretation under Florida law); *see also* Scalia & Garner, *Reading Law*, 183–89 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails.").

Because a harmonious reading of the Distributor Agreement limits the arbitration provision to It Works and a distributor, the arbitration provision does not cover It Works' claims against Melaleuca. Melaleuca's arguments to the contrary are unavailing.

Even if the arbitration provision covered It Works' claims against Melaleuca, compelling arbitration would still be inappropriate because It Works is not relying on the Distributor Agreement to bring its claims against Melaleuca. A signatory does not rely on a contract to assert its claims against a non-signatory when the signatory's claims rely on obligations otherwise imposed by law. *See Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887–88 (11th Cir. 2018); *see also CJ's Sales and Serv. of Ocala, Inc. v. Powersecure, Inc.*, No. 5:18-CV-351-Oc-30PRL, 2018 WL 6788797, at *2 (M.D. Fla. Aug. 21, 2018) (Moody, J.). If a law outside of the contract places duties on the non-signatory, then any alleged breaches flow from that law—not the contract. *See Leidel*, 729 F. App'x at 887–88 ("Because [the signatory's] claims rely on obligations allegedly imposed by law and in recognition of public policy to persons who are strangers to the [agreement], his claims neither rely on nor bear a significant relationship to those agreements.").

None of It Works' four claims against Melaleuca rely on the Distributor Agreement because each claim arises from alleged breaches of duties otherwise imposed by law. In Florida, a claim for tortious interference is independent from a claim for breach of contract. *See Grupo Televisa v. Telemundo Commc'ns Grp.*, 485 F.3d 1233, 1243 (11th Cir. 2007). What is more, "a plaintiff can maintain a cause of action against a third party for tortious interference in a contract even though he might not be able to enforce the underlying contract." *Id.* And It Works' three other claims arise under federal and state statutory law—not the Distributor Agreement. As a result, Melaleuca cannot

10

compel It Works to arbitrate its claims because It Works does not rely on the Distributor Agreement to pursue its claims against Melaleuca.

To support its argument that It Works' claims should be arbitrated, Melaleuca relies heavily on two Eleventh Circuit cases: *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999) and *Becker v. Davis*, 491 F.3d 1292 (11th Cir. 2007). But *Lawson* expressly abrogated those decisions and clarifies that, after *Carlisle*, state law decides whether a non-signatory may compel a signatory to arbitration. *Lawson*, 648 F.3d at 1171. Further, *Kroma* refers to Florida's equitable estoppel test as a "two-step framework": (1) the non-signatory must show the signatory's reliance on the agreement and (2) the arbitration clause must cover the dispute. *Kroma*, 845 F.3d at 1354.[1] Therefore, Melaleuca's arguments are unavailing and its motion to compel arbitration is denied.

<u>Motion to Dismiss</u>

To survive a motion to dismiss, a complaint must include enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is facially plausible when the plaintiff pleads facts that allow the

---

[1] Melaleuca also argues that the Court should compel arbitration because It Works' claims allege "substantially interdependent misconduct" between Melaleuca and the Distributor Defendants. (Doc 118, pp. 7–10). But the caselaw that discusses "interdependent and concerted misconduct" as a way of employing equitable estoppel largely rely on pre-*Lawson* caselaw. *See, e.g.*, *Rolls-Royce PLC v. Royal Caribbean Cruises LTD.*, 960 So. 2d 768, 771 (Fla. 3d Dist. Ct. App. 2007) (citing *MS Dealer*). Therefore, the Court relies on the "two-step framework" that the Eleventh Circuit articulated in *Kroma*.

court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A court must accept factual allegations in the complaint as true and view them most favorably to the nonmoving party. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). Although a complaint need not contain detailed factual allegations, conclusory allegations are not entitled to a presumption of truth. *Twombly*, 550 U.S. at 570 (citations omitted); *Iqbal*, 556 U.S. at 679.

Melaleuca moves to dismiss each count against it in the amended complaint. (Doc. 118, p. 16). The Court will address each count in order.

Count II: Tortious Interference with Business Relationships

Melaleuca argues that It Works failed to allege direct action by Melaleuca to support a claim for tortious interference. (*Id.* at 23). According to Melaleuca, It Works' tortious-interference claim focuses on the Distributor Defendants' actions to interfere with It Works distributors—not Melaleuca's actions. (*Id.* at 24). Melaleuca argues that It Works' failure to allege direct interference by Melaleuca is fatal to the tortious-interference claim and thus that the Court should dismiss this count. (*Id.* at 24–25).

To state a claim for tortious interference with a business relationship, a plaintiff must plausibly allege four elements: "(1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference

12

with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv. Corp., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).

It Works' complaint plausibly alleges each element of a claim for tortious interference with a business relationship. First, It Works alleges the existence of a business relationship, under which It Works has rights, between It Works and its distributors—the Distributor Agreement. Second, It Works alleges that Melaleuca knew about It Works' business relationship with its distributors. Third, It Works alleges that Melaleuca intentionally interfered with It Works' relationship with its distributors by recruiting those distributors to obtain It Works' trade secret and confidential information (i.e., Downline Activity Reports and access to eSuite). Fourth, It Works alleges that it suffered damages in the form of losing high-earning distributors and exposing trade secrets and confidential information to a competitor. These allegations are sufficient to sustain attack under Rule 12(b)(6) for a claim of tortious interference with a business relationship. The Court denies Melaleuca's motion to dismiss this count.

Count III: False Advertising under the Lanham Act

Melaleuca argues that It Works fails to plausibly allege false advertising under the Lanham Act because It Works never alleges that Melaleuca's advertisements were false or deceived distributors. (Doc. 118, p. 19). Also, Melaleuca argues that It Works must satisfy Federal Rule of Civil Procedure 9(b)'s "heightened pleading requirement" to

13

plausibly allege a false-advertising claim under the Lanham Act. (*Id.*). Because It Works failed to plead its false-advertising claim with particularity—or Rule 8's pleading requirement, for that matter—Melaleuca concludes that this claim should be dismissed. (*Id.* at 19–23).

In response, It Works argues that false-advertising claims under the Lanham Act need not meet Rule 9(b)'s heightened pleading requirement. (Doc. 129, p. 13). And even if it does, It Works contends that it pleaded enough facts to state a plausible claim for relief. (*Id.* at 13–14). As a result, It Works argues that its false-advertising claim should not be dismissed. (*Id.* at 16).

A plaintiff alleging false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), must plead "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014). To succeed on a false-advertising claim, the plaintiff must prove five elements: (1) the defendant's advertisements were false or misleading; (2) the defendant's advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresentation affected interstate commerce; and (5) the plaintiff has been, or is likely to be, injured as a result of the false advertising. *11th Cir. Pattern Jury. Instr. Civ.* 10.8 (2020); *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1316 (11th Cir. 2020).

It Works fails to plausibly allege a claim for relief under the Lanham Act for false advertising. To begin, It Works never pleads that the distributors are "consumers" under the Act. But the second and third elements of a false-advertising claim require It Works to allege that consumers were deceived. Indeed, the false advertisement's effect on consumers lies at the heart of a false-advertising claim. *See Supplement Ctr., LLC v. Evol Nutrition Assocs., Inc.*, 389 F. Supp. 3d 1281, 1288–89 (N.D. Ga. 2019) (discussing pleading requirements for the second and third elements of false-advertising claim). It Works never alleges that employees or distributors lured by a competitor—by either truthful or deceitful means—constitute consumers under the Lanham Act.[2]

Further, It Works alleges no "advertisements" made by Melaleuca. Instead, It Works' amended complaint references allegedly false statements Distributor Defendants made about their income and It Works' financial situation. (Doc. 107, ¶¶55–60, 62–69, 72, 85). It Works alleges that the Distributor Defendants made these allegedly false statements at Melaleuca's direction or encouragement or that Melaleuca condoned the Distributor Defendants' actions. (*Id.* at ¶¶ 55, 60, 65–66, 79, 84, 90, 92, 94–95). But It Works never alleges that Melaleuca directly made false statements or "advertisements" to It Works distributors. Instead, It Works' false-advertising claim

---

[2] *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 563 (5th Cir. 2001) ("[I]t seems unlikely that the injury alleged here—fraudulent misrepresentations made to potential employees to convince them to work for and buy from Amway, resulting ultimately in lower sales of some of P&G's products—is of a type that Congress sought to redress in providing the Lanham Act."), *abrogated by Lexmark*, 134 S. Ct. 1377.

against Melaleuca is more closely characterized as a contributory false advertising claim. *See Duty Free Amer., Inc. v. Estee Lauder Co., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (stating what a plaintiff must show to state a contributory false advertising claim). But It Works' amended complaint does not allege contributory false advertising by Melaleuca. As a result, It Works' false-advertising claim falls short.

At oral argument, It Works raised two new arguments. Both fail. First, It Works argued that the distributors who Melaleuca targeted with its false statements and "advertisements" *are* consumers under the Lanham Act because they purchase It Works products. That argument fails because It Works' amended complaint contains no allegations that its distributors are consumers under the Lanham Act. (*See* Doc. 107); *see also Holloway v. Oxygen Media, LLC*, 361 F. Supp. 3d 1213, 1218 (N.D. Ala. 2019) (Bowdre, J.) (stating that the court will consider only well-pleaded facts alleged in a complaint).

Second, It Works argued that an alleged effect on consumers is unnecessary for a false-advertising claim under the Lanham Act because, in *Lexmark*, the advertisements were made to remanufacturers—not consumers. But It Works' argument fails to consider a key factual difference between *Lexmark* and this case. In *Lexmark*, Static Control brought a false-advertising claim against Lexmark for misrepresentations to customers about its "Prebate" program and false statements to remanufacturers that it was illegal to use Static Control's products to refurbish cartridges. 134 S. Ct. at 1384. In

both instances, Lexmark's statements were to consumers: customers who bought Lexmark's cartridges and remanufacturers that purchased Static Control's products. *Id.* at 1383–84. Here, It Works fails to allege that Melaleuca made false statements to any consumer. As a consequence, *Lexmark* does not support It Works in this regard.

Ultimately, It Works fails to plausibly allege that its distributors are "consumers" under the Lanham Act. And It Works fails to allege that Melaleuca made any false statements or "advertisements" to It Works distributors. Therefore, the Court grants Melaleuca's motion to dismiss this count.

### Count IV: Defend Trade Secrets Act

Similar to its argument about false advertising, Melaleuca argues that It Works fails to allege a plausible claim under the Defend Trade Secrets Act because It Works failed to identify its trade secrets with particularity. (Doc. 118, p. 17). Also, Melaleuca argues that It Works cannot prove that it kept its trade secrets and proprietary information confidential. (*Id.* at 18).

To plausibly allege a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, the plaintiff must adequately plead three elements: (1) the plaintiff owns a valid trade secret; (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce; and (3) the defendant misappropriated that trade secret. *See 11th Cir. Pattern Jury. Instr. Civ.* 11.1.

It Works plausibly alleges a claim for relief under the Defend Trade Secrets Act.

17

First, It Works alleges that its Distributor Agreement expressly states that the Downline Activity Reports constitute trade secrets. It Works also alleges that its eSuite website contains proprietary and confidential information. Second, It Works alleges that its Downline Activity Reports and confidential information relate to products sold in interstate commerce. (*See, e.g.*, Doc. 107, ¶4) ("Melaleuca has thousands of distributors across the United States and is a competitor of It Works"). Third, It Works alleges that Melaleuca misappropriated It Works' trade secret when it recruited It Works distributors and, through those distributors, acquired and used It Works' Downline Activity Reports to determine which other It Works distributors to recruit. As a result, the Court denies Melaleuca's motion to dismiss this count.[3]

Count V: Florida Uniform Trade Secrets Act

The Florida Uniform Trade Secrets Act and the Defend Trade Secrets Act generally share the same elements. *See Compulife Software*, 959 F.3d at 1311 n.13. To satisfy the pleading requirements under the Florida Uniform Trade Secrets Act, the plaintiff need only allege facts that plausibly show that a trade secret was involved and that give notice to the defendant about the alleged trade secrets at issue. *DynCorp Int'l v. AAR Airlift Grp.*, 664 F. App'x 844, 848 (11th Cir. 2016).

---

[3] The Court need not decide whether It Works must satisfy Rule 9(b)'s pleading requirement because its amended complaint clearly alleges that the trade secrets and confidential information at issue are the Downline Activity Reports and eSuite.

18

It Works' complaint alleges a plausible claim for relief under the Florida Uniform Trade Secrets Act because it provides facts showing that its Downline Activity Reports are trade secrets and that information on its eSuite is confidential. It Works' complaint gives Melaleuca sufficient notice about the alleged trade secrets at issue. The Court denies Melaleuca's motion to dismiss this count.

### Staying the Case Pending Arbitration

Immediately preceding this order, this Court ruled that It Works must arbitrate the issue of whether its claims for injunctive relief against the Distributor Defendants is arbitrable. (Doc. 201). Until that arbitrability issue is decided, this Court stayed this action against the Distributor Defendants. (*Id.* at 11). So, having concluded that Melaleuca cannot compel It Works to arbitrate its claims against Melaleuca, the Court must now decide how to proceed given the posture of this case.

Courts have discretion to stay nonarbitrable claims when litigants advance arbitrable and nonarbitrable claims. *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004). If feasible to proceed with litigation, courts generally refuse to stay proceedings with respect to nonarbitrable claims. *Id.* "Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Id.* (citation omitted).

If the arbitrator decides that It Works must arbitrate its injunctive-relief claims against the Distributor Defendants, then those arbitrable claims would predominate

19

and any decision on It Works' nonarbitrable claims against Melaleuca might affect arbitration. It Works' trade secret and trade misappropriation claims are against both the Distributor Defendants and Melaleuca, and the facts supporting those claims are very much intertwined. (Doc. 107, ¶¶ 150–64, 165–79). A decision in one proceeding might affect the other. *See Klay*, 389 F.3d at 1204 (affirming district court that, in refusing to stay litigation of nonarbitrable claims, considered whether a decision in one proceeding would have "preclusive effect in the other"). As a result, staying litigation of It Works' nonarbitrable claims against Melaleuca is appropriate because It Works' arbitrable (if so decided in arbitration) claims predominate and a decision in one proceeding might impact the other. *See also Variable Annuity Life Ins. Co. v. Laferrera*, 680 F. App'x 884 (11th Cir. 2017) (holding that the district court abused its discretion in not staying litigation of nonarbitrable claims where those claims were "based on the same exact factual allegations" as the arbitrable claims).

## Conclusion

Melaleuca cannot compel It Works to arbitrate its claims against Melaleuca because Melaleuca was not a signatory to the agreement between It Works and its distributors. Further, the arbitration provision does not cover It Works' claims against Melaleuca, and It Works does not rely on the Distributor Agreement to pursue its claims against Melaleuca.

It Works alleges plausible claims for relief for tortious interference with a

business relationship and misappropriation of a trade secret under the Defend Trade Secrets Act and Florida Uniform Trade Secrets Act—but not for false advertising under the Lanham Act. Finally, because the Distributor Defendants' claims sent to arbitration will likely affect the nonarbitrable claims against Melaleuca, the Court will stay the case pending the conclusion of that arbitration.

Accordingly, the following is **ORDERED**:

1.   Melaleuca's motion to compel arbitration is **DENIED**.

2.   Melaleuca's motion to dismiss (Doc. 118) is **GRANTED-IN-PART** and **DENIED-IN-PART**:

    a.   Melaleuca's motion to dismiss It Works' claim for tortious interference with a business relationship (Count II) is **DENIED**.

    b.   Melaleuca's motion to dismiss It Works' claim for false advertising under the Lanham Act (Count III) is **GRANTED**. Count III is **DISMISSED**.

    c.   Melaleuca's motion to dismiss It Works' claim for trade-secret misappropriation under the Defend Trade Secrets Act (Count IV) is **DENIED**.

    d.   Melaleuca's motion to dismiss It Works' claim for trade-secret misappropriation under the Florida Uniform Trade Secrets Act (Count V) is **DENIED**.

21

3.   This case is **STAYED** pending the arbitrator's decision on the arbitrability of It Works' claims for injunctive relief against the Distributor Defendants.

4.   The Clerk is **DIRECTED** to administratively close this case and terminate any pending motions.

**ORDERED** in Tampa, Florida, on April 27, 2021.

Kathryn Kimball Mizelle
United States District Judge

22